**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1206**

WU TIEN LI-SHOU,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Senior District Judge. (1:13-cv-01366-JFM)

Argued: December 10, 2014 Decided: January 23, 2015

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge King joined.

**ARGUED:** Timothy Burke Shea, NEMIROW HU & SHEA, Washington, D.C., for Appellant. Douglas Neal Letter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Thomas G. Corcoran, Jr., BERLINER, CORCORAN & ROWE, LLP, Washington, D.C., for Appellant. Stuart F. Delery, Assistant Attorney General, Anne Murphy, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

WILKINSON, Circuit Judge:

Wu Tien Li-Shou, a citizen of Taiwan, seeks damages from the United States for the accidental killing of her husband and the intentional sinking of her husband's fishing vessel during a NATO counter-piracy mission. The district court dismissed the action under the political question and discretionary function doctrines. For the reasons that follow, we affirm.

I.

Since the summer of 2009, the North Atlantic Treaty Organization (NATO) has conducted Operation Ocean Shield in the Gulf of Aden and the Indian Ocean waters around the Horn of Africa. NATO's offensive responds to the recognition by the United States and its allies that "Somali-based piracy against chemical and oil tankers, freighters, cruise ships, yachts, and fishing vessels poses a threat to global shipping." J.A. 48 (Dec. 2008 U.S. National Security Council report). "Piracy is a universal crime," President Bush noted in June 2007. J.A. 59 (Memorandum from the President). "The physical and economic security of the United States . . . relies heavily on the secure navigation of the world's oceans for unhindered legitimate commerce by its citizens and its partners." Id.

As part of Ocean Shield, the USS Stephen W. Groves engaged the Jin Chun Tsai 68 (JCT 68), a Taiwanese fishing ship, in the early morning of May 10, 2011. Pirates had hijacked the JCT 68

more than a year earlier, transforming the commercial vessel into a mothership from which the pirates launched attacks using skiffs stored onboard. The ship housed nearly two-dozen pirates in addition to three hostages: the master and owner of the ship, Wu Lai-Yu, and two Chinese crewmembers.

The commander of NATO Task Force 508, a commodore in the Royal Netherlands Navy, directed the USS Groves "to shadow and then disrupt the pirate mothership JCT 68." J.A. 64 (unclassified U.S. Navy investigation report). In particular, the task force commander ordered the USS Groves "to force JCT 68 to stop and surrender, including the use of non-disabling and disabling fire" starting with verbal warnings, then warning shots, followed by fire aimed at the skiffs. Id. 64-65. The USS Groves commenced this sequence on the morning of May 10. The shots ended almost an hour later.

After the pirates had indicated their surrender, a special team from the USS Groves approached and boarded the JCT 68. Weapons used by the pirates, including two rocket-propelled grenade launchers, were littered throughout the ship. The team found Master Wu in his sleeping quarters "with the crown of his head shot off." Wu v. United States, 997 F. Supp. 2d 307, 309 (D. Md. 2014). Three pirates were also killed in the engagement, and the two Chinese crewmembers were rescued safely. The next day, May 11, 2011, the USS Groves intentionally sunk the JCT 68

with Wu's body on board pursuant to orders from the NATO task force commander.

Two years later, Master Wu's widow initiated this action against the United States, seeking damages for her husband's death and the loss of the JCT 68 under the Public Vessels Act (PVA), 46 U.S.C. § 31101 et seq., the Suits in Admiralty Act (SIAA), 46 U.S.C. § 30901 et seq., and the Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301 et seq. The district court granted the government's Rule 12(b)(1) motion to dismiss, reasoning that the complaint presented a nonjusticiable political question. Wu, 997 F. Supp. 2d at 309-10. The court also noted that even if subject matter jurisdiction were proper, Wu's claims would be "futile" in light of the discretionary function exception to any waiver of the government's sovereign immunity from suit. Id. at 309 n.2.

We review a dismissal under Rule 12(b)(1) de novo. In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 333 (4th Cir. 2014). We apply the clear error standard to the "district court's jurisdictional findings of fact on any issues that are not intertwined with the facts central to the merits of the plaintiff's claims." U.S. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009).

II.

Wu challenges the district court's conclusion that her tort suit presents a nonjusticiable political question. Because allowing this action to proceed would thrust courts into the middle of a sensitive multinational counter-piracy operation and force courts to second-guess the conduct of a military engagement, we agree that the separation of powers prevents the judicial branch from hearing the case.

A.

The political question doctrine "is primarily a function of the separation of powers." Baker v. Carr, 369 U.S. 186, 210 (1962); see also Taylor v. Kellogg Brown & Root Servs., Inc., 658 F.3d 402, 408 (4th Cir. 2011) (explaining the "genesis" of the doctrine in Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803)). It is not a matter of whether the dispute strictly falls within one of the categories over which the federal courts have subject matter jurisdiction. Baker, 369 U.S. at 198. Rather, a question is "political" and thus nonjusticiable when its adjudication would inject the courts into a controversy which is best suited for resolution by the political branches. Id. at 210-11. A case presents a nonjusticiable political question where there is

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable

> standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. at 217. These formulations do not provide a clean, crisp test. Id. (noting "the impossibility of resolution by any semantic cataloguing"). Rather, we must undertake a "case-by-case inquiry." Id. at 211.

"Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense." Tiffany v. United States, 931 F.2d 271, 277 (4th Cir. 1991). Of course, "[t]he military does not enjoy a blanket exemption from the need to proceed in a non-negligent manner." Id. at 280. But it is not within the purview of "judicial competence" to review purely military decisions. Lebron v. Rumsfeld, 670 F.3d 540, 548 (4th Cir. 2012). We must be wary where plaintiff's "negligence claim would require the judiciary to question actual, sensitive judgments" made by the armed forces. Taylor, 658 F.3d at 411 (internal quotation marks omitted). Cases that require courts to second-guess these decisions run the risk not just of making bad law, but also of "imping[ing] on explicit constitutional assignments of

responsibility to the coordinate branches of our government." Lebron, 670 F.3d at 548.

B.

This case presents a textbook example of a situation in which courts should not interfere. Resolving this dispute would oblige the district court to wade into sensitive and particularized military matters. In order to reach a finding of negligence on the part of the United States, Wu would have the court consider the precise details of the military engagement: what kind of warnings were given, the type of ordnance used, the sort of weapons deployed, the range of fire selected, and the pattern, timing, and escalation of the firing. J.A. 8-9 (complaint); Appellant's Br. 5-7, 7 n.1. Wu is quite direct about this, criticizing the USS Groves for, among other things, "using exploding ordnance on the fishing boat rather than inert ordnance and firing into central compartments rather than at the skiffs on the bow or the boat's engines." Appellant's Br. 3. The case would not need to proceed to trial for the court to find itself enmeshed in this rigging. Discovery easily could draw the court and the parties into the technicalities of battle, with subpoenas issuing to NATO and American commanders on down to the Gunnery Direction Officer.

As judges, we are just not equipped to second-guess such small-bore tactical decisions. We also are ill-suited to

evaluate more strategic considerations. We do not know the waters. We do not know the respective capabilities of individual pirate ships or naval frigates. We do not know the functionality and limitations of the counter-piracy task force's assets. We do not know how a decision to tow and not to sink the JCT 68 would have affected the task force's mission by tying down valuable naval resources. We do not know the extent of the disruption to commercial shipping caused by any single ship or by Somali-based piracy generally. What we do know is that we are not naval commanders. These are questions not intended to be answered through the vehicle of a tort suit.

That is not all. This case threatens to involve the courts in the command structures of both the U.S. military and Operation Ocean Shield. Wu bases her claim of negligence on the USS Groves's failure to follow the proper rules of engagement. Appellant's Br. 8, 19-20; Reply Br. 4-5, 5 n.1. Specifically, she asserts that Navy vessels involved in what Wu terms as law enforcement "are governed by the law enforcement parameters set down by the U.S. Coast Guard." Reply Br. 5 n.1. But selecting the proper rules of military engagement is decidedly not our job. This request that we do so encourages the courts to bull their way into the chain of command of a multinational operation. In fact, Wu would have us sit astride the top of the

command pyramid and decree the proper counter-piracy strategies and tactics to the NATO and American commanders below.

Moreover, Wu explicitly urges us to repudiate the NATO commander's direct order, see J.A. 67, to sink the JCT 68 under the rationale that "the U.S. Navy chain of command maintained control of the [USS Groves] at all times," Reply Br. 6. The disruption caused to our alliances by treating allied command decisions as advisory or second-rate is all too evident. One need only imagine the Dutch NATO commander fielding deposition questions in a federal lawsuit about decisions he made concerning naval vessels carrying military grade weapons in the context of a multinational counter-piracy mission in the Indian Ocean. Whatever protective orders courts might issue to avoid litigative tension within the NATO alliance would be under constant challenge, given the perceived relevance of the Dutch commodore's order to plaintiff's negligence claims.

Further, if we accepted Wu's invitation, we would open the door to allegations that soldiers and sailors should treat more skeptically the clear orders of their superiors. We would afford military personnel a reason and incentive to question orders -- namely, to head off tort liability or at least the burdens of litigation that come with being sued. Allowing discovery here would permit inquiry into the wisdom of the order to sink the JCT 68. But the extent to which NATO counter-piracy operations

must accommodate "the property rights of shipowners" from various nations "dispossessed of their ships by pirates" is not justiciable without inquiry into every engagement with hijacked vessels, including vessels used by pirates as heavily armed bases for further disruptions of commercial shipping lanes. Appellant's Br. 21.

Wu next points to a provision in the Public Vessels Act, which allows litigating parties to subpoena crewmembers of a public vessel, as proof that there are procedures in place for deciding a case like this. Id. 38 n.12, 39. But crewmembers may only be subpoenaed if the Secretary who heads the department or the vessel's commander consents. 46 U.S.C. § 31110. More importantly, this procedure is beside the point. Subpoenaing members of the military is not necessarily itself an attack on the separation of powers. Asking probing questions about the strategy, tactics, and conduct of a military operation, however, is just such an affront.

It is, after all, the President who is commander-in-chief. U.S. Const. art. II, § 2, cl. 1; see also Lebron, 670 F.3d at 549. It is, after all, Congress which holds "plenary control over rights, duties, and responsibilities in the framework of the military establishment, including regulations, procedures, and remedies." Chappell v. Wallace, 462 U.S. 296, 301 (1983); see also U.S. Const., art. I, § 8, cl. 11 (power to declare

war); id. cl. 12-13 (power to establish an army and navy); id. cl. 14 (power "[t]o make Rules for the Government and Regulation of the land and naval Forces"). And, as our discussion has made abundantly clear, this controversy lacks discernible rules and standards for judicial resolution.

C.

Several of Wu's specific contentions merit mention. She objects to the district court's description of the altercation between the USS Groves and the JCT 68 as "a belligerent operation." Wu, 997 F. Supp. 2d at 309; Appellant's Br. 17-20, 29. In fact, Wu repeatedly characterizes Operation Ocean Shield as little more than an oceanic traffic stop or "a traditional police action on the high seas," and analogizes the incident with the JCT 68 to "a police officer stopping a vehicle on any highway." Appellant's Br. 10, 19, 20. She stresses that the government is attempting to escape responsibility by establishing a safe zone between belligerency and ordinary law enforcement actions. Thus the deference we offer is, under Wu's view, misplaced.

Wu misunderstands both the district court's use of the term "belligerent" and the law. Wu may be correct that the NATO's counter-piracy activities do not amount to "belligerency" in the law of war meaning. See Black's Law Dictionary 184 (10th ed. 2014) (defining "belligerency" as "the quality, state, or

condition of waging war"). But it is difficult for a court even to define what war is. Campbell v. Clinton, 203 F.3d 19, 26 (D.C. Cir. 2000) (Silberman, J., concurring) (questioning the existence of "a coherent test for judges to apply to the question what constitutes war"). Yet the district court did not say that the USS Groves's actions constituted "war," nor does the government assert that the frigate was engaged in "war." Gov't Br. 35 n.10. It is clear to us that the district court's use of the word "belligerent" was vernacular, not technical. That does not mean, however, that the USS Groves was engaged in a mere law enforcement action. Nothing about the events of May 10 and 11, 2011 -- from their far away location, to the international forces and threat involved, to the military command structure and equipment deployed -- is "consistent with a traditional police action." See Appellant's Br. 19. American military forces typically do not take part in simple law enforcement, see 18 U.S.C. § 1385 (Posse Comitatus Act); 32 C.F.R. § 182.6(a)(3) (applying Posse Comitatus Act to the Navy), and there is nothing to suggest garden-variety police activity here.

Regardless, a state of war in the technical sense did not have to exist for the actions of the USS Groves to be unreviewable by the courts. As the Eleventh Circuit has noted, "judicial intrusion into military practices would impair the

discipline that the courts have recognized as indispensable to military effectiveness." Aktepe v. United States, 105 F.3d 1400, 1404 (11th Cir. 1997). That case involved negligence claims by Turkish sailors against the United States for injuries arising out of a NATO training exercise. Id. at 1401-02. War did not need to be declared for the political question doctrine to apply to this sort of tort suit against the United States. It is enough that plaintiff "ask[s] the courts to intrude in an area in which they have no rightful power and no compass." Smith v. Reagan, 844 F.2d 195, 202 (4th Cir. 1988) (refusing under the political question doctrine to entertain an action for a declaratory judgment under the Hostage Act). The cases Wu cites for the proposition that liability may attach to the United States for negligent acts of Navy vessels are not to the contrary, for none of them involved a military engagement. See Ira S. Bushey & Sons, Inc. v. United States, 398 F.2d 167 (2d Cir. 1968); Pac.-Atl. S.S. Co. v. United States, 175 F.2d 632 (4th Cir. 1949); United States v. The Australia Star, 172 F.2d 472 (2d Cir. 1949); Bank Line v. United States, 163 F.2d 133 (2d Cir. 1947); Lind v. United States, 156 F.2d 231 (2d Cir. 1946); Ocean S.S. Co. of Savannah v. United States, 38 F.2d 782 (2d Cir. 1930).

Wu also seems to suggest that because the USS Groves "recaptured" the JCT 68, the district court possessed admiralty

jurisdiction pursuant to the law of prize. See Appellant's Br. 33-35; Reply Br. 7. But the law of prize only applies where the captor demonstrates "an intention to seize and to retain as prize." The Grotius, 13 U.S. (9 Cranch) 368, 370 (1815); see also 28 U.S.C. § 1333 (granting federal district courts exclusive jurisdiction over claims "for the condemnation of property taken as prize" (emphasis added)). The law of prize in essence adjudicates claims to ownership. See Jennings v. Carson, 8 U.S. (4 Cranch) 2, 23 (1807) (The courts "decide who has the right, and they order its delivery to the party having the right."); 3 Op. Att'y Gen. 377 (1838); Thomas J. Schoenbaum, 1 Admiralty & Mar. Law § 3-2 (5th ed. 2011 & Supp. 2014). It is doubtful that the JCT 68 was ever a prize, because neither the USS Groves nor the NATO task force claimed or intended to claim ownership of the JCT 68. See generally The Siren, 80 U.S. (13 Wall.) 389, 391-93 (1871) (describing English origins of law of prize). As the district court recognized, "prize cases are in rem actions, not tort suits." Wu, 997 F. Supp. 2d at 309.

III.

Wu also challenges the district court's holding that the United States retains its sovereign immunity from suit because it was engaged in the exercise of a discretionary function. While this is framed as an alternative ground for decision, it decidedly is not because the political question doctrine and the

discretionary function exception to waivers of sovereign immunity overlap here in important respects. Wu contends that, although the exception applies to the Suits in Admiralty Act, it does not apply to suits brought under the Public Vessels Act and that, even if it did, the sinking of the JCT 68 was beyond the bounds of the USS Groves's discretion.

A.

The SIAA and the PVA both waive sovereign immunity for in personam admiralty suits. The SIAA does so where, "if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained." 46 U.S.C. § 30903(a); see also McMellon v. United States, 387 F.3d 329, 334-37 (4th Cir. 2004) (en banc) (discussing history of government waiver as to admiralty suits). The PVA waives immunity for actions brought to recover "damages caused by a public vessel of the United States." 46 U.S.C. § 31102(a)(1). Neither statute contains an explicit exception to the scope of its waiver. In this respect, the statutes are unlike the Federal Tort Claims Act (FTCA), which expressly prohibits courts from hearing claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the

Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

Nevertheless, in McMellon v. United States, 387 F.3d at 349, this court sitting en banc held that "the SIAA must be read to include a discretionary function exception to its waiver of sovereign immunity." The discretionary function exception "is grounded in separation-of-powers concerns." Id. at 341 (citing United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808, 814 (1984)); see also Tiffany v. United States, 931 F.2d 271, 276 (4th Cir. 1991). Because the separation of powers is a constitutional doctrine, "the courts must adhere [to it] even in the absence of an explicit statutory command." Canadian Transp. Co. v. United States, 663 F.2d 1081, 1086 (D.C. Cir. 1980). The SIAA must thus contain an implied discretionary function exception. Otherwise, the courts would become arbiters of "administrative and legislative . . . policy judgments." Gercey v. United States, 540 F.2d 536, 539 (1st Cir. 1976). That would be an "intolerable" result. In re Joint E. & S. Dists. Asbestos Litig., 891 F.2d 31, 35 (2d Cir. 1989).

This logic applies with equal force to the PVA. The same separation-of-powers concerns that were present with the SIAA are present here. Without the discretionary function exception, "all administrative and legislative decisions concerning the

public interest in maritime matters would be subject to independent judicial review in the not unlikely event that the implementation of those policy judgments were to cause private injuries.” Gercey, 540 F.2d at 539. That outcome is inconsistent with our Constitution. We are not alone in reaching this conclusion as to the PVA. In fact, every circuit to consider the issue has held that the PVA contains an implied discretionary function exception. Thames Shipyard & Repair Co. v. United States, 350 F.3d 247, 254 (1st Cir. 2003); B & F Trawlers, Inc. v. United States, 841 F.2d 626, 630 (5th Cir. 1988); Tobar v. United States, 731 F.3d 938, 945 (9th Cir. 2013); U.S. Fire Ins. Co. v. United States, 806 F.2d 1529, 1534–35 (11th Cir. 1986), abrogated on other grounds by United States v. Gaubert, 499 U.S. 315 (1991).

B.

In applying the discretionary function exception, we look to FTCA cases for guidance. McMellon, 387 F.3d at 349. The discretionary function exception applies to “conduct” that “involves an element of judgment or choice.” Berkovitz v. United States, 486 U.S. 531, 536 (1988). Where a case implicates such a choice, it does not matter “whether or not the discretion involved be abused.” 28 U.S.C. § 2680(a). The conduct of a military engagement is the very essence of a discretionary function. Cases involving the use of military force lure courts

into considering "complex, subtle, and professional [military] decisions." Gilligan v. Morgan, 413 U.S. 1, 10 (1973). All military engagements involve discretionary decisions by military commanders of all ranks -- choices that have to be made quickly during moments of pronounced pressure.

Wu's suit relies on questioning the wisdom of a series of discretionary decisions, some of which we noted in the preceding section. How should the warnings to the pirates have been framed? What type of ordnance should have been used? What weapons should have been used? At what range should the USS Groves have fired from? Where precisely should the fire have been directed? In light of the task force's resources and the goals of the counter-piracy mission, should the JCT 68 have been sunk? "The list of inquiries is virtually endless and the umbrella of negligence would encompass them all." Tiffany, 931 F.2d at 279. The Supreme Court has held "that the selection of the appropriate design for military equipment . . . is assuredly a discretionary function." Boyle v. United Techs. Corp., 487 U.S. 500, 511 (1988). All the more so would operational decisions such as whether to sink a damaged pirate mothership in the waters off of the Horn of Africa count as discretionary functions too. Even if the NATO and American commanders abused their discretion "so as to frustrate the relevant policy," the fact that the function is discretionary ab initio exempts those

choices from judicial review. Gaubert, 499 U.S. at 338 (Scalia, J., concurring in part and concurring in the judgment). "The inquiry is thus whether the discretion exists, not whether in later litigation it is alleged to have been abused." Holbrook v. United States, 673 F.3d 341, 350 (4th Cir. 2012).

Wu insists that the USS Groves acted in contravention of law and thus that the government cannot claim the discretionary function exception as a safe harbor. Reply Br. 9-11. But Wu does not identify a law that would permissibly have circumscribed the USS Groves's course of action. Wu points to the Annotated Supplement to the Commander's Handbook on the Law of Naval Operations (Nov. 1997 ed.), Articles 18 and 19 of the 1958 Geneva Convention on the High Seas, and Articles 104 and 105 of the United Nations Convention on the Law of the Sea (UNCLOS). Appellant's Br. 32-33, 34 n.9; Reply 5 n.1, 7 n.3. The Handbook, however, notes that it provides only "general guidance" and "is not a comprehensive treatment of the law." Handbook 1 (Nov. 1997 ed.).[1] "International treaties," moreover, "are not presumed to create rights that are privately enforceable." Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 968 (4th Cir. 1992). Non-

[1] Wu cites to the 1997 Annotated Supplement. The Handbook was reissued in 2007. That newer version also states that it provides only "general guidance" and "is not a comprehensive treatment of the law." The Commander's Handbook on the Law of Naval Operations 19 (July 2007 ed.).

self-executing treaties "do not by themselves function as binding federal law." Medellin v. Texas, 552 U.S. 491, 504 (2008). The 1958 Geneva Convention on the High Seas contains no provision indicating that it is self-executing, and Wu offers no statutory provision implementing the Convention. Wu admits that the United States is not even a signatory to UNCLOS. Appellant's Br. 33.

In sum, nothing in this collection of documents deprives the United States and its NATO allies of the discretion inherent in sovereignty to conduct military operations free of judicial oversight or hindsight. Nothing in these documents purports to anticipate the myriad evolving circumstances that commanders encounter on the ground or on the seas, much less which of the many possible options those commanders should choose in responding to them. In short, the firing upon the JCT 68 and the subsequent sinking of that vessel were discretionary acts that the judiciary may not take it upon itself to review.

IV.

Wu asserts that the district court should have allowed discovery or at least held an evidentiary hearing to establish that this case is justiciable. See Appellant's Br. 17-18, 29; Reply Br. 15-17. She points to our recent decision in Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 534, 537 (4th Cir. 2014), as demonstration that discovery is needed to determine if

the claim may proceed. But that case is very different from the case at bar. Al Shimari involved a private contractor working for the federal government, a situation for which this Court has developed a specialized political question doctrine analysis. See id. at 533-34 (explaining test developed in Taylor v. Kellogg Brown & Root Servs., Inc., 658 F.3d 402 (4th Cir. 2011)). More importantly, in Al Shimari we were "unable to assess whether a decision on the merits would require the judiciary 'to question actual, sensitive judgments made by the military.'" 758 F.3d at 536 (quoting Taylor, 658 F.3d at 411). The complaint and accompanying record in this case do not suffer from the same defects.

Whether or not every single fact in the Navy's unclassified investigative report is accurate, it quite clearly provided an overall picture of the military engagement. The district court was not required to litigate every fact in the report before making the political question or discretionary function determination, because litigating the facts would constitute just the sort of involvement that those doctrines are designed to avoid. We do not for a moment trivialize either Master Wu's death or the destruction of his ship, for which diplomatic

channels should in all kindness dictate recompense.[2] But whether or not the USS Groves properly approached and engaged the JCT 68 and whether or not the USS Groves should have sunk the vessel are matters of international import and military judgment in which we are loath to interfere. Under our constitutional system of separation-of-powers, these cases raise questions that the judiciary is not empowered to answer. The district court did not err in dismissing the suit. Its judgment is

AFFIRMED.

[2] The government asserts that "[a]cting under its authority to conduct international relations," the United States has in fact made a payment to Master Wu's family. See Gov't Br. 4 n.1.